AQUA–CHEM, INC., CLEAVER–BROOKS DIVISION,
Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,
Cross–Petitioner.

Nos. 88–2191, 88–2475.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1989.
Decided Aug. 23, 1990.

Thomas W. Mackenzie, Lindner & Marsack, Milwaukee, Wis., for Aqua–Chem, Inc., Cleaver–Brooks Div.

Aileen A. Armstrong, Elliott Moore, Peter D. Winkler, Appellate Court—Enforcement Litigation, and Julie Broido, N.L.R.B., Washington, D.C., George F. Squillacote, N.L.R.B., Milwaukee, Wis., and Gerald P. Fleischut, N.L.R.B., Region 26, Memphis, Tenn., for N.L.R.B.

Before WOOD, Jr., CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

The National Labor Relations Board found the petitioner, Aqua–Chem, Inc., guilty of violating sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), (3). Aqua–Chem has petitioned for review. The Board has cross-petitioned for the enforcement of its order. We grant the Board's petition for enforcement.

### I. Factual Background

This case began when Aqua–Chem, Inc. and its employees' union could not agree on the terms of a new collective bargaining agreement. The employees eventually struck the company and Aqua–Chem was forced to hire replacement workers. This economic strike ended after five months, with the employees offering unconditionally to return to work. At the end of the strike, Aqua–Chem's workforce consisted of 25 former strikers and 69 replacement workers.

The strike settlement agreement negotiated by the parties included a provision dealing with the recall of striking employees. Under this new agreement, striking employees were to be returned to work as vacancies occurred, subject to worker qualifications. The new collective bargaining agreement, on the other hand, provided for

recall from layoff "in reverse order of lay-off." When business slowed, Aqua–Chem laid off 14 replacement workers and 1 former striker. These workers were told that their layoff was indefinite, that their life insurance would be cancelled immediately, that their medical insurance would be terminated at the end of the month and that they should look for other jobs or apply for unemployment compensation.

Subsequently, the company laid off another former striker, recalled 4 workers from layoff (3 of whom had been replacement workers) and laid off another former striker. Aqua–Chem did not consider any of the 28 strikers who had yet to be reinstated to fill the positions offered to the 3 laid-off replacement workers. Each of the unreinstated strikers had more seniority than the replacement workers who had been recalled. Some of the unreinstated strikers were qualified to fill the positions given to the recalled striker replacements.[1] In addition, at about this same time (and long after the strike had ended) Aqua–Chem sent a letter to the unreinstated strikers which stated that the reinstatement rights of these strikers would be terminated if they failed to notify the company within 5 days of their continuing interest in being recalled.

The National Labor Relations Board issued a complaint with respect to these practices, alleging that the company had violated §§ 8(a)(1) and (3) of the National Labor Relations Act. The case was tried before an ALJ who found against Aqua–Chem. The NLRB basically affirmed the ALJ's findings. Aqua–Chem has petitioned this court for review of the Board's decision. The NLRB, on the other hand, has cross-petitioned for the enforcement of its order requiring Aqua–Chem to cease and desist from engaging in the unfair labor practices we have described and requiring Aqua–Chem to offer reinstatement, with backpay, to those unreinstated strikers for whom positions were available. We grant the Board's cross-petition for the enforcement of its order.

## II. Legal Analysis

### A. Failure to Recall Strikers with More Seniority

■ The issue presented by this case is one of first impression, though the policies underlying the issue are fundamental to labor law. Section 8(a)(3) of the National Labor Relations Act protects striking workers' jobs from discrimination so that their rights to union organization and other collective activity will not be chilled.[2] This means that economic strikers are entitled to full reinstatement to their former positions at the conclusion of a strike. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967). On the other hand, labor law purports to recognize business reality and allows a company that has been struck by its work force to hire permanent replacements as business needs dictate. *NLRB v. Mackay Radio & Telegraph Co., Inc.*, 304 U.S. 333, 345–346, 58 S.Ct. 904, 910–911, 82 L.Ed. 1381 (1938). A balance between the rights of organized workers and business has been struck by allowing replacement workers to be kept on permanently (in order to give the replacement workers adequate incentive to take replacement jobs), but by requiring *genuine vacancies* in the workforce to be given, in line of seniority, to the striking workers after the strike is over. *Laidlaw Corporation*, 171 NLRB 1366 (1968), *enf'd*, 414 F.2d 99 (7th Cir. 1969).

■ Because economic strikers who have been permanently replaced but who have unconditionally offered to return to work are entitled to reinstatement upon the departure of their replacements, this case centers upon the concepts of "vacancy"

---

**1.** We note that the layoff figures offered by the two parties do not correspond exactly. We do not, however, think that any of these differences are material.

**2.** Specifically, section 8(a)(3) provides, in relevant part, that "[i]t shall be an unfair labor practice for an employer—by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...."

and "departure" employed in *Laidlaw:* How should the layoff of a permanent replacement worker—who has a contractual right to recall—affect the reinstatement rights of unreinstated strikers? When is a layoff considered permanent so as to trigger the striking workers' rights to reinstatement? These questions are presented by this case. Their answers require balancing the competing labor policies that we have discussed.

■ In this case, the NLRB adopted a burden-shifting analysis which attempted to accommodate the policy of protecting striking workers' rights to organize with a company's need to hire and protect the jobs of replacement workers. This analysis requires that the General Counsel first make a showing that any layoffs "truly signified the departure of the replacements": that the laid-off replacement workers had no "reasonable expectancy of recall." [3] Once a prima facie showing that the laid-off replacements had no "reasonable expectancy of recall" has been made, the burden shifts to the employer to rebut the showing of a vacancy or to show legitimate and substantial justifications for failing to recall the striking workers.

The narrowness of our review of NLRB decisions is well-established. We "must uphold the legal conclusions of the Board 'unless they are irrational or inconsistent with the [National Labor Relations Act].' " *David R. Webb. Co., Inc. v. NLRB,* 888 F.2d 501, 503 (7th Cir.1989), *quoting NLRB v. Parents and Friends of the Specialized Living Center,* 879 F.2d 1442, 1448 (7th Cir.1989) (citing *NLRB v. Financial Institution Employees,* 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986)); *see also NLRB v. Manitowoc Engineering Co.,* No. 89–2623, slip op. at 14–15, n. 10,

909 F.2d 963, 971, n. 10 (7th Cir.1990). We will, however, review the record of a case as a whole. *See NLRB v. Emsing's Supermarket, Inc.,* 872 F.2d 1279, 1283–1284 (7th Cir.1989). After reviewing the record in the case before us, we conclude that the fact-specific burden-shifting analysis adopted by the Board is both rational and consistent with the policies behind the NLRA because it comports with the *actual* expectations of all concerned: the unreinstated strikers, the replacement workers and the company. On that basis, we shall assess whether the Board's factual findings are supported by substantial evidence. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Aqua–Chem claims that the laid-off replacement workers actually had a "reasonable expectancy of recall" because they were guaranteed the right to be recalled in reverse order of layoff by the new collective bargaining agreement. We think, however, that Aqua–Chem's position begs the question—given the policies at issue. The replacement workers were exposed to *layoff* only because they had secured jobs by *replacing* the striking workers. Thus, the real question to be answered here is where do we strike a fair balance between the competing policies.[4]

It is undisputed that the laid-off replacement workers were told: that their layoff was indefinite, that their life insurance would be cancelled immediately, that their medical insurance would be terminated at the end of the month and that they should look for other jobs or apply for unemployment compensation. Petitioner's Brief at 15. The Board concluded that because the laid-off replacement workers had no rea-

---

3. For a list of objective factors considered relevant to the replacements' "reasonable expectancy of recall" see the May 26, 1988 Decision and Order of the NLRB, Petitioner's Appendix at 107.

4. Aqua–Chem asserts, in contrast, that the issue presented by this case was settled in *Giddings & Lewis, Inc. v. NLRB,* 675 F.2d 926 (7th Cir.1982), in which this court held that the NLRA was not violated by company rules allowing members of the existing workforce, in the event of a layoff,

to be rehired in order of seniority, but ahead of the unreinstated strikers. We disagree. There had been no actual layoffs in *Giddings.* This crucial fact, as well as the limited nature of our present review, leads us to the conclusion that the laid-off employees here were disabused, by the circumstances of their layoff, of a reasonable expectation of exercising their contractual right in a way sufficient to support the Board's analysis and conclusion in this case.

sonable expectation of recall, their layoffs and the resulting vacancies triggered the strikers' reinstatement rights.[5] In short, the Board thought that a departure of this kind—though called a "layoff"—constituted a departure sufficient to bring *Laidlaw* into play. We agree with the Board's finding that the circumstances presented to the laid-off replacement workers could reasonably have extinguished any expectancy of recall harbored by these workers on account of the contract. Since Aqua–Chem did not proffer any relevant business justification below—and has not pursued one on review—Aqua–Chem has not adequately rebutted the conclusion that, under the circumstances, the laid-off employees had no "reasonable expectancy of recall." We therefore find the Board's factual conclusions on this issue to be supported by substantial, and unrebutted, evidence.

### B. The Threat to Terminate the Strikers' Reinstatement Rights

■ On August 18, 1982 (more than 2½ years after the strike began), Aqua–Chem sent a letter to all unreinstated strikers, advising them that their reinstatement rights would be terminated if the company did not hear from them in writing within 5 days. Laid-off replacement employees (some of whom who had been out of work for almost 4 months) were not sent this letter. Instead, the laid-off replacement workers were sent a letter only at the time of their layoffs asking them to "make sure" that their current addresses were on file so that their final paychecks and recall notices would be sent to the correct addresses.

At the time Aqua–Chem sent its "short-fuse" letter to the unreinstated strikers, there were no vacancies for unreinstated strikers. In addition, several replacement employees were already on layoff from positions the company treated as unavailable to the unreinstated strikers. The Board found that this letter violated § 8(a)(1) of the National Labor Relations Act, which

makes it "an unfair labor practice for an employer—to interfere with, restrain, or coerce employees in the exercise of [their] rights [to organize]."

It has long been accepted that "certain employer conduct is inherently so prejudicial to employees' rights that an unfair labor practice is presumed unless the employer can prove legitimate and substantial business justifications to vindicate its actions." *Giddings & Lewis, Inc. v. NLRB*, 710 F.2d 1280, 1285 (7th Cir.1983). This "business justification" standard is used to assess employer actions like the letter sent by Aqua–Chem because a striking employee's right to reinstatement is also tested by this standard. Accordingly, this court has reasoned that "if an employee's statutory right to reinstatement is protected by the business justification standard, then a procedure which can destroy that right without affirmative action by the employee should be subjected to the same scrutiny." *Id.* "Administrative convenience" has been held not to constitute sufficient business justification. *Id.* at 1286.

The National Labor Relations Board ruled that the sending of this letter violated § 8(a)(1) because "the threat of termination was contained only in the letters to unreinstated strikers and not in similar letters it sent to laid-off striker replacements." May 26, 1988 Decision and Order of the NLRB at n. 2, Petitioner's Appendix at 102. As noted earlier, we review the factual conclusions of the Board only to assess whether they are supported by substantial evidence. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Under the specific circumstances of this case, we find that the "threat of termination" letter sent by Aqua–Chem was not supported by the requisite "business justification."

Although the justification proffered by Aqua–Chem—namely, the need to ascertain the whereabouts of unreinstated strikers who had been out of work for over 2½

---

**5.** We also agree with the Board's finding that the letter mailed to those on layoff, which indicated that Aqua–Chem would make every effort to return the laid-off employees to work, was sufficiently vague so as not to override the laid-off employees' expectancy that they probably would not return to work at Aqua–Chem.

years so that their addresses would be known when they were needed for work—may have been "sufficient" in the sense that it was rational, we do not accept this justification as being "legitimate." The unreinstated strikers were threatened with the loss of their reinstatement rights if they did not respond quickly. The laid-off replacement workers (who had been out of work for as long as 4 months), on the other hand, were only sent home with a gently worded letter. They were not, unlike the unreinstated strikers, sent a separate letter as time passed. This leads us to disbelieve that work concerns actually motivated Aqua–Chem to send the letter worded the way it was to the unreinstated strikers. We can see no legitimate business reason why the same letter was not sent to all workers waiting to return to work. (It is important to remember that, at the time it acted, Aqua–Chem was planning on rehiring those already on layoff first. It would thus have seemed more logical for Aqua–Chem, according to its own reasoning, to have attempted to ascertain their whereabouts first.)

Our conclusion is further reinforced by the fact that, at the time the letters were sent out, there were no vacancies at Aqua–Chem. There was, in short, no urgent need for the unreinstated strikers to respond so quickly. Accordingly, we again find that the Board's decision on this point was supported by substantial evidence.[6]

### III. Conclusion

Long after the conclusion of an economic strike against it, Aqua–Chem declined to consider unreinstated strikers to fill essentially vacant positions. This was a violation of the strikers' reinstatement rights under section 8(a)(3) of the National Labor Relations Act. Some time later, Aqua–Chem sent a "short-fuse" letter threatening termination to the remaining unreinstated strikers if they did not forward cer-

tain information within 5 days. This was a violation of section 8(a)(1) of the NLRA. Because we agree with the Board that these two acts unfairly chilled the strikers' rights to organize and to strike, Aqua–Chem's petition for review is denied and the Board's cross-petition for the enforcement of its order is granted.

ENFORCEMENT GRANTED

---

6. Aqua–Chem contends that the Board's lack of explanation with respect to this count renders its decision erroneous. We disagree. In footnote 2 of its Decision and Order, the Board summarily concluded that section 8(a)(3) was violated because the "short-fuse" threat of termi-

nation letter was not sent to the laid-off replacement workers in addition to the unreinstated strikers. The disparate treatment reasoning behind this conclusion is obvious, and we affirm it.