**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**DELTA–MACON BRICK AND TILE COMPANY, INC., and Delta Brick, a Division of Boral Bricks, Inc., Respondents.**

**No. 90–4381.**

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1991.

---

Paul Hitterman, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., and Julie Broido, Atty., Washington, D.C., for N.L.R.B.

Shannan M. Kane, Washington, D.C., Tom Kilpatrick and Susan S. Hughey, Smith, Currie & Hancock, Atlanta, Ga., for Intervenor, United Broth. of Crpntrs. & Joiners.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a labor case of Great Expectations: the expectations of striking employees and the expectations of those hired to permanently replace them. Both seek protective materials in the statutory framework and the developing caselaw. We reasonably expect that our decision will be a disappointment to one or the other.

## LOST LABOR

Following unsuccessful efforts to renegotiate a collective bargaining agreement with its employer Delta–Macon Brick and Tile Company ("the Company") in the summer of 1979, approximately one hundred and seventy-five of the Company's two hundred and thirty-five union employees began an economic strike in support of their wage demands. In response, the Company hired thirty-seven employees as "permanent striker replacements" to fill the positions vacated by the strikers. Within twelve days, the Company and the Union settled the strike, and the strikers made unconditional offers to return to work. The Company reinstated all of the strikers except the thirty-seven whose jobs had been displaced by the permanent striker replacements. The Company placed the unreinstated strikers on a preferential hiring list and advised them that they would be rehired as job vacancies became available.

Although operations at the Company were back to normal, all was not well; the Company was feeling the brunt of the impending economic recession of the early 1980's. On January 30, 1980, due to deteriorating business conditions, the Company laid off seventy employees, five of whom were among the thirty-seven permanent striker replacements. Although the Company usually experienced annual layoffs due to the natural business cycles of the building industry, the January 1980 layoff was the most drastic in the Company's thirty year history. The Company advised the laid-off employees that their health insurance benefits would cease with the termination of their employment, but they could, if they chose to, pay for the insurance themselves. The Company did not indicate when the laid-off employees could expect to return to work.

Fourteen to sixteen months later, in March and May 1981, the Company recalled the five permanent striker replacements

laid off in January 1980.[1] In recalling them, the Company gave no consideration to offering those five positions to any of the thirty-seven unreinstated strikers whose names were on the preferential recall list since the termination of the strike in September 1979. These unreinstated strikers had substantially greater seniority than the five permanent replacements who were recalled by the Company.

On account of the Company's failure to first offer the recall positions to the thirty-seven unreinstated strikers, the Union, the United Brotherhood of Carpenters and Joiners of America, filed an unfair labor practice charge with the National Labor Relations Board ("the Board") against the Company alleging violations of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"). The General Counsel issued a complaint against the Company, and the case came before an Administrative Law Judge ("the ALJ") for trial. On June 9, 1982, the ALJ issued a decision recommending that the complaint be dismissed. Concluding that the laid-off, permanent striker replacements had a "reasonable expectation of recall," the ALJ held that the layoffs did not create job vacancies which the Company was later obligated to offer the unreinstated strikers. The General Counsel noted its exceptions to the ALJ's decision.

Six years later, the Board remanded the case to the ALJ to allow the General Counsel to show, in accordance with *Aqua–Chem, Inc.*, 288 N.L.R.B. 1108, 1988 WL 214299 (May 26, 1988), *enforced*, 910 F.2d 1487 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991), that the five permanent replacements who were laid off had no reasonable expectancy of recall. In *Aqua–Chem*, the Board adopted a "burden-shifting analysis which attempt[s] to accommodate the policy of protecting striking workers' rights to organize with a company's need to hire and protect the jobs of replacement workers." 910 F.2d at 1490. The test "requires that the General Counsel first make a showing that any layoffs truly signified the departure of replacements: that the laid-off replacement workers had no 'reasonable expectancy of recall.' " *Id.* If the General Counsel makes a prima facie showing, then "the burden shifts to the employer to rebut the showing of a vacancy or to show legitimate and substantial justifications for failing to recall the striking workers" ahead of the permanent replacements. *Id.*

On remand, the ALJ held an evidentiary hearing at which the five permanent striker replacements testified about the events surrounding their layoff and subsequent recall. Two of the replacements testified that when they were laid off, the Company told them that they would be recalled when work picked up, but the Company did not indicate when that might happen. One of the replacements testified that he was told nothing when he was laid off. The testimony of the two other replacements suggests that they too expected that they might be recalled, but they were not told when that might occur.[2]

On July 21, 1989, the ALJ issued its supplemental decision concluding, contrary to its 1982 decision, that the permanent replacements did *not* have a reasonable expectancy of recall. The ALJ based its decision not on the testimony of the five replacement witnesses, but rather on a clause in the collective bargaining agreement which provided that an employee laid off for a short period—not to exceed one week—could be recalled to his or her job regardless of seniority. By implication, the ALJ reasoned that once the layoff exceed-

---

1. The revival was short-lived, however; by December 1981, the Company laid off the five permanent replacements along with fifty-seven other employees.

2. Because of the length of time which had elapsed between the layoffs and the hearing before the ALJ (some nine years), the witnesses' memories had faded; the ALJ specifically found their testimony "not particularly reliable on such questions as what they were told when laid off, what they did in the intervening period, or even which job they were laid off from and recalled to." The Board rejected the ALJ's finding that by virtue of the passage of time the replacements' testimony was " 'not particularly reliable' regarding what they were told when they were laid off." 297 N.L.R.B. No. 178, slip op. at 4 n. 9.

ed one week, "one on layoff would have no expectation of recall to his or her job in the event that more senior people in the department were out of work and available for recall." Because the Company did not assert a "legitimate and substantial justification[ ]" for hiring the replacements ahead of the unreinstated strikers, the ALJ found that the Company violated the Act.

On review, the Board affirmed the ALJ's July 21, 1989 ruling, albeit on different grounds. The Board found the ALJ's reliance on the contractual seniority clause in the collective bargaining agreement misplaced, and relied instead "on other factors" which, in the Board's view, suggested the same conclusion: that the laid-off, permanent striker replacements did not have a reasonable expectancy of recall. 297 N.L.R.B. No. 178, slip op. at 4–5. Specifically, the Board was persuaded by "the unprecedented nature of the layoff, its indefinite duration, ... that employees were given no specific indication as to when, if ever, they might be recalled, and that their medical insurance benefits were cancelled." *Id.* at 5. The Board concluded, therefore, that the Company violated § 8(a)(1) and § 8(a)(3) of the Act. The Board then petitioned this court for enforcement, and the Company cross-petitioned for review.

## LABORING THE POINT

■■ The right of employees to organize and strike has a long and important history in our nation's labor relations jurisprudence. Those rights have been protected for decades by the National Labor Relations Act, which prohibits employers from discriminating against employees who have engaged in a lawful strike to protest arguably unsatisfactory pay. 29 U.S.C. § 151 *et seq.* When employees engage in an "economic" strike, an employer may not retaliate against the striking employees by refusing to reinstate them upon their unconditional offers to return to work; otherwise, such retaliation would "discourage employees from exercising their rights to organize and strike guaranteed by ... the Act." *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19

L.Ed.2d 614 (1967). Accordingly, an employer must reinstate the returning strikers to their former positions absent a "legitimate and substantial business justification." *Id.* (quoting *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967)). "[O]ne such justification arises when, in an economic strike, returning strikers' jobs have been filled by workers hired as permanent replacements during the strike in order to continue operations." *Eastern Air Lines v. Air Line Pilots Ass'n Intern.,* 744 F.Supp. 1140, 1142 (S.D.Fla.1990) (citing *Fleetwood*), *affirmed,* 920 F.2d 722 (11th Cir.1990).

■ Thus, while the Act is sensitive to the rights of strikers and the potential for retaliation against them for disrupting the employer's business, the Act is equally responsive to the needs of the employer to maintain its operations throughout a strike. Toward that end, an employer whose employees are engaging in an economic strike, may, without violating the rights of striking employees, hire other persons to fill the void left by the striking employees. *NLRB v. Mackay Radio & Telegraph Co., Inc.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938) ("*Mackay*"); *see also Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989) ("We held that it was not an unfair labor practice under § 8 of the NLRA for the employer to have replaced the striking employees with others 'in an effort to carry on the business,' or to have refused to discharge the replacements in order to make room for the strikers at the conclusion of the strike.") (quoting *Mackay*). In that way, labor law recognizes the realistic needs of business entities to continue with their operations during an economic strike and thus avoid financial collapse.

■■ To induce a worker to accept employment during an economic strike, an employer may offer the worker a permanent position that will not be subject to divestment when the strike is over. *See Aqua–Chem, Inc., Cleaver–Brooks Div. v.*

*NLRB*, 910 F.2d 1487, 1489 (7th Cir.1990) (*"Aqua–Chem I"*). Thus, although an economic striker is entitled to full reinstatement upon termination of the strike, he may have no job awaiting his return if the employer permanently replaced him during the strike. In such a circumstance, the returning striker, although retaining his seniority over the permanent striker replacement, must await the availability of a job vacancy before he will be reinstated. As the Seventh Circuit has observed:

> A balance between the rights of organized workers and business has been struck by allowing replacement workers to be kept on permanently (in order to give the replacement workers adequate incentive to take replacement jobs), but by requiring *genuine vacancies* in the workforce to be given, in line of seniority, to the striking workers after the strike is over.

*Aqua–Chem I*, 910 F.2d at 1489 (emphasis in original) (citing *Laidlaw Corporation*, 171 N.L.R.B. 1366 (1968), *enforced*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970)). The returning striker's reinstatement is therefore contingent upon the existence of a job vacancy.

■ A genuine job vacancy, commonly known as a *"Laidlaw* vacancy," may arise when, for example, the company expands its workforce or discharges a particular employee, or when an employee quits or otherwise leaves the company. A *Laidlaw* vacancy is not created, however, when the company temporarily lays off a permanent striker replacement—as a company might do if its production schedule were seasonal, *e.g., Mike Yurosek & Son, Inc*, 295 N.L.R.B. No. 35, 1989 WL 224160 (June 15, 1989) (vegetable processing)—so long as the laid-off, permanent striker replacement has a reasonable expectancy that he will be recalled by the company following the layoff. *Aqua–Chem I*, 910 F.2d at 1490. This is so because an employer may "promise [permanent striker replacements] that if they are subsequently laid off the layoff will not create vacancies that the employer must fill by recalling the strikers whom the replacement workers had replaced and who

by definition will have greater seniority, having been hired earlier." *Aqua–Chem, Inc., Cleaver Brooks Div. v. NLRB*, 922 F.2d 403, 403 (7th Cir.1991) (Posner, J., dissenting from denial of rehearing en banc) (*"Aqua–Chem II"*). When laid-off, permanent striker replacements have an objectively "reasonable expectancy of recall," the employer may recall them ahead of the unreinstated strikers.

■ The question presented in this case is whether the Board was correct in concluding that the January 1980 layoff, precipitated by unforeseen economic circumstances, left the laid-off, permanent striker replacements with no objectively reasonable expectancy of recall. Put another way, we must decide whether the layoff created *Laidlaw* vacancies which the Company should have offered to the unreinstated strikers before recalling the laid-off, permanent striker replacements. If so, the Company violated the Act.

■ The parties do not dispute the status of the respective workers. The thirty-seven employees hired during the pendency of the strike were admittedly hired as permanent striker replacements under *Mackay*, 58 S.Ct. at 910–11, and thus, the Company lawfully retained them under its employ at the conclusion of the strike. The Company had no obligation to discharge the thirty-seven permanent striker replacements to make room for the returning strikers.

■ Nor do the parties dispute the applicable test for determining whether the Company committed an unfair labor practice; they agree that the Board's "burden-shifting analysis" approved by the Seventh Circuit in *Aqua–Chem I* "is both rational and consistent with the policies behind the NLRA because it comports with the *actual* expectations of all concerned: the unreinstated strikers, the replacement workers and the company." *Aqua–Chem I*, 910 F.2d at 1490 (emphasis in original); *see also NLRB v. Curtin Matheson Scientific Inc.*, 494 U.S. 775, 110 S.Ct. 1542, 1545 n. 2, 108 L.Ed.2d 801 (1990) (holding that the Court must assess whether the Board's

legal standard is "rational and consistent with the Act"). Under the Board's "burden-shifting analysis" approved in *Aqua–Chem I*, the General Counsel bore the initial burden of proving a *prima facie* case of a *Laidlaw* vacancy by establishing the following elements: (1) a strike occurred; (2) the strikers made an unconditional offer to return to work; (3) the employer laid off permanent striker replacements; (4) the employer recalled the laid-off, permanent striker replacements from the layoff rather than reinstating the former strikers; and (5) "based upon objective factors, the laid-off permanent replacements had no reasonable expectancy of recall." *See Aqua–Chem*, 288 N.L.R.B. at 1110, *quoted in Mike Yurosek & Son, Inc.*, 295 N.L.R.B. No. 35, slip op. at 5.

Employing this analysis in the instant case, the Board concluded that the recall of those five permanent striker replacements fourteen to sixteen months after the layoff, ahead of the unreinstated strikers, amounted to an unfair labor practice. Because the parties did not dispute the satisfaction of the first four elements, the Board's conclusion turned on its finding that the permanent striker replacements had no reasonable expectancy of recall following the January 1980 layoff. The Board reasoned that the layoff signified a permanent departure of the laid-off, permanent striker replacements so that when the Company sought to expand its workforce fourteen months later, those jobs constituted genuine vacancies to which the unreinstated strikers were entitled on the basis of seniority.

■ Our review of the Board's conclusion is limited in scope; we must "determine, on the basis of the record taken as a whole, whether or not substantial evidence supports the Board's findings." *Centre Property Management v. NLRB*, 807 F.2d 1264, 1268 (5th Cir.1987); *accord NLRB v. Hood Furniture Manufacturing Co.*, 941 F.2d 325, 328–29 (5th Cir.1991). Although we give great deference to the Board's findings, "we must also consider that evidence which fairly detracts from the Board's decision." *Centre Property Management*, 807 F.2d at 1268.

■ Our review in this case is complicated somewhat because the Board and the ALJ were not in substantial agreement as to the rationale for finding a violation of the Act. Although the ALJ, like the Board, ultimately concluded that the Company had violated the Act by recalling the permanent striker replacements, the ALJ based that conclusion on a single premise, specifically rejected by the Board: that the seniority provision of the collective bargaining agreement informed the question of whether the laid-off, permanent striker replacements had a reasonable expectancy of recall.[3] The Board concluded, and we agree, that the procedures for recall from layoff are not relevant to the inquiry of whether the layoff created vacancies triggering the Company's statutory obligation to reinstate former strikers. Instead, the Board relied on "other factors" in concluding that the permanent striker replacements were permanently terminated by virtue of the layoff. Those "other factors," however, were

---

**3.** The Union, intervenor in this action, advocates that view. Although the Union is correct in asserting that the permanent replacements must abide by the terms of their unit's collective bargaining agreement, *see J.I. Case v. NLRB*, 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762 (1944), these employees should not be forced to relinquish their rights as replacement employees merely because of a special recall provision in the agreement. Indeed, before economic strikers can utilize these recall procedures, a vacancy must exist. *Mike Yurosek & Son, Inc.*, 295 N.L.R.B. No. 35, slip op. at 6. And as the Board recognized in *Aqua–Chem*, not all layoffs of striking employees signify their permanent departure. We believe, therefore, that the Board correctly declined to focus its inquiry on

the seniority provisions of the collective bargaining agreement in determining whether a particular layoff triggered the reinstatement rights of the economic strikers.

The other clause of the collective bargaining agreement upon which the Union relies, providing that employees' seniority ends after nine months on layoff, fails for similar reasons. Furthermore, it is irrelevant to our inquiry because the ALJ found that the Company waived the clause and the Union did not challenge the particular finding before the Board. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982) (under § 10(e) of the Act, a finding not challenged before the Board is not subject to judicial review).

the same factors originally considered by the ALJ in 1982 when it found that the five laid-off, permanent striker replacements *did* have a reasonable expectancy of recall. Because the ALJ's supplemental decision merely reflected the ALJ's misplaced reliance on the seniority provision of the collective bargaining agreement, it is plain to us that the ALJ and the Board did not agree on whether the objective factors (aside from the seniority clause) left the replacements with a reasonable expectancy of recall.

We have held that "[w]hen the Board's findings conflict with the ALJ's, the records, including the ALJ's report, must be subjected to particular scrutiny. Such scrutiny is more searching than it is when the Board and the ALJ are in agreement." *Centre Property Management*, 807 F.2d at 1268; *accord NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 362 (5th Cir.1990). Our searching scrutiny here leads us to the conclusion that the record is devoid of substantial evidence to support the Board's factual finding that the laid-off, permanent striker replacements had no reasonable expectancy of recall.

The Board's decision rested on its assessment of the "objective factors" bearing on the question of whether the laid-off replacements maintained a reasonable expectancy of recall. As the Board stated in reviewing this case:

> The objective factors that the Board views as relevant in determining whether a reasonable expectancy of recall exists include, inter alia, evidence concerning the employer's past business experience, the employer's future plans, the length, as well as the circumstances, surrounding the layoff, and what employees were told concerning the likelihood of their being recalled.

297 N.L.R.B. No. 178, slip op. at 3-4; *see also Aqua–Chem*, 288 N.L.R.B. at 1110

(citing *Atlas Metal Spinning Co.*, 266 N.L.R.B. 180 (1983); *Bancroft Cap Co.*, 245 N.L.R.B. 547 (1979)). Principally, however, the Board was persuaded by the undisputed fact that the January 1980 layoff was of unprecedented dimension and the undisputed fact that the permanent striker replacements were not told when they might expect to be recalled. While these facts certainly inform the inquiry, we believe they do not amount to substantial evidence to support the Board's finding for several reasons.

In the first place, the Board itself has noted its disagreement with the "reasoning that only brief layoffs ... will permit the recall of laid off permanent replacements ahead of unreinstated strikers. This reasoning fails to satisfactorily take into account the employer's right to permanently replace economic strikers and to assure the replacements of the permanency of their positions." *Mike Yurosek & Son, Inc.*, 295 N.L.R.B. No. 35, slip op. at 4. "A replacement could hardly be called 'permanent' were we to find that every layoff for an indefinite period creates a vacancy which activates a striker's reinstatement rights." *Aqua–Chem*, 288 N.L.R.B. at 1109 (citing *Giddings & Lewis, Inc. v. NLRB*, 675 F.2d 926 (7th Cir.1982) (denying enforcement)); *see also Aqua–Chem II*, 922 F.2d at 404 (Posner, J., dissenting from denial of rehearing en banc) ("A permanent replacement is in fact temporary if in the next economic downturn his recall rights will be pushed below that of every former striker."). Obviously, the Board itself has rejected the notion that "an economic layoff of permanent replacements for a prolonged indefinite period is *per se* a vacancy that triggers the unreinstated strikers' *Laidlaw* rights." *Aqua–Chem*, 288 N.L.R.B. at 1109. Accordingly, the fact that the layoff was of an extended duration or of unprecedented proportions is of little import.[4]

---

**4.** We note that we are not persuaded that the termination of health insurance benefits alone signifies that the layoff amounted to a permanent departure of the employees. No evidence in the record establishes a correlation between the discontinuation of health insurance benefits and the likelihood of recall from which it might be inferred that the discontinuation of health insurance benefits constitutes a litmus test in determining whether the employees possessed a reasonable expectancy of recall.

 Second, the Board does not contend, and there is no evidence in the record to suggest, that the January 1980 "layoff" was in actuality a "pretextuous coverup for discharges or quits." *Bancroft Cap Co.,* 245 N.L.R.B. 547, 551, 1979 WL 9984 (1979) (affirming, but qualifying in relevant part, the rulings, findings, and conclusions of the ALJ).[5] The evidence in the record unequivocally establishes that economic circumstances motivated the massive layoff, and that the Company typically experienced annual layoffs—though not as drastic—due to such circumstances. This is not a case in which the employer decided to permanently cut back on the size of its workforce following the abandonment of a product line or a long term shift in its business focus. *See, e.g., Foam Fabricators of Minnesota, Inc.,* 273 N.L.R.B. 511, 1984 WL 37151 (1984) (company reduced workforce because its primary customer would no longer be purchasing the company's product). Rather, this is a case in which economic turmoil, precipitated by cyclical forces, affected the industry at large, and the Company genuinely expected the demand for its product to return to normal as the economy regained momentum.

Finally, the only additional evidence adduced at the evidentiary hearing following the Board's remand was the testimony of the five permanent striker replacements. Their testimony buttressed, rather than detracted from, the ALJ's original conclusion that they maintained a reasonable expectancy of recall. Two of the replacements specifically testified that the Company informed them that they would be recalled when work picked up; two replacements intimated the same; one testified that he was told nothing. Significantly, *none* of the replacements testified that the Company told them anything indicating that they would not be recalled, distinguishing this case from *Aqua–Chem,* in which the employer informed the laid-off employees "that they should look for other jobs or apply for unemployment compensation." [6] *Aqua–Chem I,* 910 F.2d at 1490. Moreover, the ALJ specifically found, after hearing the testimony of the five replacement workers, that they "could have expected to be recalled within the first week of their layoff." In light of the seniority provisions of the collective bargaining agreement, however, the ALJ concluded that they lost that expectancy after one week. Because we conclude that the seniority provisions of the collective bargaining provisions should not have informed the ALJ's decision, we are left with the explicit finding that the five replacements *did* have a reasonable expectancy of recall upon being laid off.

## FRUITS OF OUR LABOR

It is clear that the Company could not accord "superseniority" to the permanent striker replacements; once the economic strikers were reinstated, they were entitled to their level of seniority as it existed before the strike. It is also clear that the returning strikers were entitled to reinstatement as soon as a job vacancy arose. We have concluded, however, that the January 1980 layoff did not create genuine job vacancies obligating the Company to offer the jobs, in line of seniority, to the unreinstated strikers. The Board's ruling to the contrary is not supported by substantial evidence.

We find sustenance for our conclusion in the Seventh Circuit's decision in *Giddings*

5. In *Bancroft,* the Board qualified the ALJ's conclusion that "absent a pretextuous 'layoff' to cover up discharges, quitting, or termination, the length of the layoff is immaterial in the determination of whether a vacancy to which an unreinstated striker would be entitled to exists." 245 N.L.R.B. at 547 n. 1. We agree with the Board that the projected length of a layoff is a salient factor in assessing whether a layoff creates a *Laidlaw* vacancy. Nonetheless, we believe that the *absence* of a "pretextuous coverup for discharges or quits" is worthy of mention because the *presence* of such a pretext would surely cut against the objective reasonableness of the expectancy of recall.

6. Apparently, none of the laid-off, permanent replacements in *Aqua–Chem* were told by the company that they could ever expect to be recalled.

*& Lewis,* a case pre-dating *Aqua–Chem I,*[7] in which the court observed:

> In light of the inevitable fluctuations which occur in the nation's economy, with their concomitant impact on the labor force, such a system serves only to assure replacements the permanent status to which *Mackay* says they are entitled. Affirmance of the Board's holding that layoffs activate a striker's right to reinstatement would eviscerate the *Mackay* rule. Employers attempting to hire replacement workers could guarantee them employment only until a layoff occurred. Such replacement workers could hardly be called "permanent." In the event of a layoff, unreinstated workers would inevitably replace their "permanent" replacements. Such an outcome would significantly interfere with what the *Mackay* Court found to be the employer's legitimate interest in maintaining production during an economic strike.

675 F.2d 926, 930 (7th Cir.1982). We hold, therefore, that the Company did not violate the Act by recalling the laid-off, permanent striker replacements ahead of more senior, not yet reinstated, economic strikers.

ENFORCEMENT DENIED.

---

7. We recognize that the judges of the Seventh Circuit disagreed over the application of *Giddings & Lewis* to the *Aqua–Chem* case. *Compare Aqua–Chem I,* 910 F.2d at 1490 n. 4 *with Aqua–Chem II,* 922 F.2d at 404 (Posner, J., dissenting from denial of rehearing en banc). We need not concern ourselves with their dispute because we have found *Aqua–Chem* to be distinguishable from our case. *See supra* note 4 and accompanying text.