**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**O'DANIEL TRUCKING COMPANY, Respondent.**

No. 93–2441.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1994.

Decided May 2, 1994.

---

Joan E. Hoyte, N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Paul J. Speilberg (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, Joseph H. Solien, N.L.R.B., Region 14, St. Louis, MO, for N.L.R.B.

Joseph A. Yocum, Yocum & Yocum, Evansville, IN (argued), for respondent.

Before POSNER, Chief Judge, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

O'Daniel Trucking Company ("O'Daniel") operates a construction and material supply business, headquartered in Carmi, Illinois. In addition to its Carmi facility, the company owns a yard operation in East Carmi and a sand and gravel dredge facility in Maunie, Illinois. O'Daniel produces, sells, and transports asphalt and ready-mix concrete and is engaged in the construction and repair of highways, driveways, and parking lots. It also hauls and disposes of waste from a local coal mine.

During its peak period in the summer, O'Daniel employs between fifty and sixty workers. Some of these workers are permanent employees and work for the company year-round. Others are hired temporarily to work on specific projects that may last from a few days to as much as one year. If the company needs temporary workers to assist with its public projects, (construction and repair of town and city streets), and to a much lesser extent some private construction projects, it obtains them from various union "hiring halls." In the past, O'Daniel has frequently hired temporary laborers from the Southern Illinois Laborer's District Council, Laborers International Union of North America, AFL–CIO's ("Union") hiring hall.

In 1973, O'Daniel entered into a collective-bargaining agreement with the Congress of Independent Unions ("CIU"). Under the terms of that agreement, O'Daniel agreed "to recognize the [CIU] as the sole and exclusive collective bargaining agency for all their employees," excluding heavy equipment operators. The agreement also states that new employees are "required to join the [CIU] after 31 calendar days from the date on which they are first employed." If an employee fails to join the CIU within 31 days or is otherwise not a member of the CIU in good standing, the agreement requires O'Daniel to discharge that employee within three working days of receiving notice from the CIU. The agreement specifically allows O'Daniel to hire temporary workers from other labor unions whenever it becomes necessary.

In 1974, O'Daniel and the Union entered into a pre-hire collective bargaining agreement, pursuant to section 8(f) of the National Labor Relations Act ("ACT"), 29 U.S.C. § 158(f),[1] whereby the Union agreed to provide laborers from its hiring hall to work on O'Daniel's public projects. Under the terms of that agreement, O'Daniel agreed to make fringe benefit payments to the Union's health and welfare trust fund. The parties' relationship continued uninterrupted until December 1992 when O'Daniel notified the Union that it would not enter into a new agreement.

On January 31, 1992, the Union filed a representation petition with the National Labor Relations Board ("Board"), pursuant to

---

1. "Section 8(f) allows employers in the building and construction industry to enter into a collective bargaining agreement with a union before the union has attained majority status among the firm's employees." *New Berlin Grading Co. v. NLRB*, 946 F.2d 527, 529 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992). These agreements, known as pre-hire agreements, are generally illegal except in the construction industry pursuant to section 8(f). *Martin v. Garman Constr. Co.*, 945 F.2d 1000, 1001 n. 3 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1244, 117 L.Ed.2d 476 (1992).

section 9(c) of the ACT, 29 U.S.C. § 159(c),[2] seeking certification as the exclusive collective-bargaining representative of all laborers who work on O'Daniel's public highway projects. O'Daniel opposed the Union's petition, contending that its collective-bargaining agreement with the CIU already covered its highway project laborers and thus, there was a contract-bar to the Union's petition.

A hearing was held before Board hearing officer Donald F. Jueneman on March 27, 1992. During the hearing, both the Union and O'Daniel stipulated that "should the Regional Director determine that there is no contract bar and that an election should be held, that the appropriate unit would include all construction laborers employed ... at [O'Daniel's] heavy and highway construction job sites. Excluding all drivers, operators, office and clerical and professional employees, guards and supervisors, as defined in the Act."

On March 10, 1992, the Board's Regional Director issued a Decision and Direction of Election. The Regional Director found that there was no contract-bar to the Union's petition because there was no evidence that a *majority* of the employees in the proposed bargaining unit had selected or designated the CIU as their exclusive bargaining unit.[3] Accordingly, the Regional Director ratified the stipulated bargaining unit and directed that an election be held to determine whether the unit employees wanted the Union to be their collective-bargaining representative.

O'Daniel asked the Board to review the Regional Director's Decision and Direction of Election. The Board denied O'Daniel's request, finding that it raised no substantial issue warranting review.

On April 8, 1992, the Board conducted a secret-ballot election in the appropriate unit. Of seven eligible voters, six voted in favor, and one against, having the Union as their exclusive collective-bargaining representative. There were four challenged ballots; however, even if all four ballots were invalidated, the outcome of the election would not have been affected. O'Daniel filed a timely objection with the Board, arguing that the election should be set aside because Union officials allegedly "advised the employees that if they did not vote for [the Union] they faced the loss of their pension benefits and, also, possible loss of their level of employment which also, in turn, would reduce their benefits." O'Daniel supported its objection with the affidavits of its Vice President John O'Daniel and its Secretary James Edwards. The O'Daniel officials state that they were told by six unit employees that union officials had told the employees that they would lose work, pension and other benefits if they voted against the Union.

The Regional Director conducted an investigation into O'Daniel's objections. After reviewing the above-mentioned affidavits, the testimony of the Union's business agent John R. Taylor, and the signed statements of the six unit employees, the Regional Director concluded that, even if the employees made the statements in question, they were insufficient to warrant setting aside the election. Accordingly, the Regional Director overruled O'Daniel's objections and certified the Union as the unit's exclusive bargaining representative.

O'Daniel filed timely exceptions to the Regional Director's decision, contending that he had erred in not setting aside the election

2. Section (9) provides in pertinent part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining.... The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit or subdivision thereof...."

3. Specifically, the Regional Director found that: (1) "[t]he record fails to establish that the CIU presented signed membership cards from a majority of current employees to the Employer prior to entering into the collective-bargaining agreement;" (2) "[t]he record establishes that although not all employees of the Employer are members of the CIU, the CIU has never sought their discharge;" (3) "[t]he record further fails to establish that the Employer signed any agreement recognizing the CIU as the exclusive bargaining representative of a majority of unit employees."

based on the alleged coercive conduct by the Union's officials. In the alternative, O'Daniel argued that it was entitled to a hearing on whether the election should be set aside. The Board denied O'Daniel's request for review, finding that its exceptions raised no substantial issue warranting review.

On July 23, 1992, the Union filed an unfair labor practice charge with the Board alleging that O'Daniel had refused to bargain with the Union. On August 12, the Regional Director issued a complaint charging the company with refusal to bargain in violation of sections 8(a)(5) and (1) of the ACT, 29 U.S.C. §§ 158(a)(5) and 158(a)(1). In its answer to the Regional Director's complaint, O'Daniel admitted that it had refused to bargain with the Union. However, O'Daniel argued that it had no duty to bargain because the Board had erred in certifying the Union as the unit's exclusive bargaining representative. O'Daniel again attacked the validity of the election and the Board's determination of the appropriate bargaining unit.

The General Counsel moved to transfer this case to the Board and for summary judgment, alleging that there were no disputed issues of fact warranting a hearing and that the issues raised in O'Daniel's answer were or could have been litigated in the representation proceeding. On October 23, the Board entered an order transferring this case to itself and issued a Notice to Show Cause why the General Counsel's summary judgment motion should not be granted.

On December 14, 1992, the Board issued its Decision and Order, granting the General Counsel's motion for summary judgment. The Board found that all of the issues raised by O'Daniel "were or could have been litigated in the prior representation proceeding." It also found that O'Daniel had not alleged "any special circumstances that would require the Board to reexamine the decision made in the representation proceeding." Thus, the Board held that O'Daniel had violated sections 8(a)(5) and (1) of the Act by refusing to bargain. The Board ordered O'Daniel to cease and desist from its refusal to bargain with the Union, and affirmatively ordered O'Daniel to "to bargain on request with the Union, and, if an understanding is reached, to embody that understanding in a signed agreement."

On June 16, 1993, the Board filed an application for enforcement with this court, and O'Daniel made a timely answer.

### Standard of Review

■ We will enforce an order of the Board as long as its "factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law." *NLRB v. Shelby Memorial Hosp. Ass'n,* 1 F.3d 550, 554 (7th Cir.1993) (quoting *NLRB v. Augusta Bakery Corp.,* 957 F.2d 1467, 1471 (7th Cir.1992)). Substantial evidence is " 'more than a mere scintilla' "—it is enough " 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Roadmaster Corp. v. NLRB,* 874 F.2d 448, 452 (7th Cir.1989) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). "[W]e must uphold the Board's legal conclusions unless they are irrational or inconsistent with the National Labor Relations Act." *Shelby Memorial Hosp. Ass'n,* 1 F.3d at 555 (citing *Aqua–Chem, Inc., Cleaver–Brooks Div. v. NLRB,* 910 F.2d 1487, 1490 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991)).

### Discussion

O'Daniel makes two arguments against enforcement of the Board's order. First, it contends that the Board certified an inappropriate bargaining unit. Next, it argues that the Board erred by not setting aside the representation election because of coercive tactics used by Union officials to influence the outcome of the election. At the very least, O'Daniel argues that a hearing should have been held to determine whether the election results should have been set aside.

### Bargaining Unit

■ O'Daniel challenges the Board's determination of the appropriate bargaining unit, arguing that workers included in the unit share a strong "community of interest" with workers excluded from the unit. Accordingly, O'Daniel argues that the Board

erred in not certifying a larger group of "job titles" as the appropriate bargaining unit.

■ We must reject O'Daniel's argument. During the representation hearing, O'Daniel and the Union stipulated that if the Regional Director found that there was no contract-bar to the Union's petition, then the Regional Director's proposed bargaining unit was the appropriate one. Our cases make clear that once the parties stipulate to an appropriate bargaining unit, that unit is binding regardless of whether the "community of interest" standard has been met. As we said in *NLRB v. Speedway Petroleum*, 768 F.2d 151, 156 (7th Cir.1985):

> The Board is prohibited, however, from applying the 'community of interest' standard to change a result mandated by an unambiguous pre-election stipulation which does not contravene the Act or settled Board policy. Courts have not viewed the multi-faceted inquiry under the 'community of interest' standard as constituting an established Board policy.

(citation omitted). *See also NLRB v. J.J. Collins' Sons, Inc.*, 332 F.2d 523 (7th Cir. 1964) (the parties' stipulation of the appropriate bargaining unit could not be overridden by the Board even though the unit may not have satisfied the "community of interest" test); *NLRB v. Midwest Television, Inc.*, 370 F.2d 287 (7th Cir.1966) (same); Francis M. Dougherty, Annotation, *"Community of Interest" Test in NLRB Determination of Appropriateness of Employee Bargaining Unit*, 90 A.L.R. Fed. 16 § 3 (1988) (cases collected therein).

Here, the parties unambiguously stipulated that "should the Regional Director determine that there is no contract bar and that an election should be held, that the appropriate unit would include all construction laborers employed ... at [O'Daniel's] heavy and high-way construction job sites. Excluding all drivers, operators, office clerical and professional employees, guards and supervisors, as defined in the Act." This stipulation was binding on the Board and the parties irrespective of whether the "community of interest" test was satisfied. Thus, the Board clearly did not err by refusing to overturn the stipulated unit on the basis of the "community of interest" test.

*The Board's Refusal to Grant an Evidentiary Hearing*

O'Daniel claims that the Board erred in overruling its objections to the election. Alternatively, O'Daniel argues that the Regional Director should have at least granted a hearing on its objections.

■ A party challenging a Board conducted election "has the burden of showing that substantial evidence does not support the Board's decision." *NLRB v. Chicago Tribune Co.*, 943 F.2d 791, 794 (7th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992) (citing *Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 784 (7th Cir.1988)). To meet this burden, "the objecting party must show not only that unlawful acts occurred, but that those acts interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *NLRB v. Service American Corp.*, 841 F.2d 191, 195 (7th Cir.1988) (citation omitted).

■ A party challenging a representation election is entitled to an evidentiary hearing on its objections only if the employer "presents facts 'sufficient to support a prima facie showing of objectional conduct,' that is of 'misconduct sufficient to set aside the election under the substantive law of representation elections.'" *Chicago Tribune*, 943 F.2d at 794 (quoting *NLRB v. Lovejoy Indus., Inc.*, 904 F.2d 397, 400 (7th Cir.1990)). Accordingly, a party challenging an election because of a union's allegedly coercive conduct, is entitled to a hearing only if it presents facts sufficient to support a prima facie showing that the union engaged in coercive conduct that "so influenced potential voters that free choice was impossible." *Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 785 (7th Cir.1988) (citations omitted).

■ In support of its contention that the Union engaged in coercive tactics, the company submitted the affidavit of its Vice President John O'Daniel. He states that he telephoned various employees seeking their support in the upcoming election. When he asked for their support, he says that the

employees gave him the following responses, which O'Daniel contends show that they were coerced by the Union: Laura Baldwin—"I would like to, but my daughter had [sic] been sick and in the hospital. They said if I didn't vote yes, I would not work anymore, have insurance or retirement." Clydus Gray—"They are coming down on me hard. I'm going to apply at General Tire, I don't think they'll work me either way it turns out." Jamie Gray—"Taylor is leaning on me. I don't think I can vote for you." Bob Burkett—"I don't know how I'm going to vote. I have to speak to the others and see what they are going to do.... They have talked to me. I haven't decided." Jim Shook—"I don't know what I'll do." Joseph Tate—"I'm going to vote no. I've worked here 17 years and they pay my salary. They talked to me, trying to get me to vote yes. I told them I was voting no."

O'Daniel also submitted the affidavit of its Secretary James Edwards. Edwards states that he had a conversation with Clydus Gray who told him that "I've been talking to the business agent John Taylor. It's not going to be a disadvantage to you to lose the election, you'd have to set down and negotiate before each job anyway, according to our new contract.... If you lose the election, I hope you won't quit bidding on state jobs." Edwards also states that he talked to Bob Burkett who said "I hated to see this come up. I wanted to keep working for yous [sic]." According to Edwards, Burkett's comments were based on a previous conversation he had with Burkett where he informed Burkett that O'Daniel would not bid on any more state projects if the Union won the election.

In opposition to O'Daniel's objections, the Union presented the sworn statement of its business agent, Taylor, denying that he told employees they would get less work or lose pension and health benefits if they did not support the Union.

As part of its investigation, the Regional Director obtained statements from five of the six employees who made the alleged comments to John O'Daniel and James Edwards. Four of the six employees indicate in sworn statements that they were never told by Union officials that they would lose work, insurance, or pension benefits if they voted against the Union. Laura Baldwin specifically denied telling John O'Daniel that the Union threatened her with loss of benefits or work if she voted against the Union. Clydus Gray stated that "I do not remember saying '[t]hey are coming down hard on me.' I may have said that last summer during the strike, when other employees called me. The Union never threatened me. The Union was not involved in that." Jamie Gray denies that she told John O'Daniel that Taylor was leaning on her and states that the Union did not tell her how to vote in the election. Bob Burkett states that he was never contacted by the Union concerning how he planned to vote in the election. Jim Shook made no statement to the Board agent conducting the investigation. Joseph Tate, in an unsworn statement, says that he was not contacted by the Union concerning how he planned to vote in the election.

The Regional Director issued a Supplemental Decision and Certification of Representative overruling O'Daniel's objections:

> The conduct attributed to the Petitioner by the Employer by the first employee witness [Laura Baldwin] does not implicate the Petitioner as the source of the information; the first employee witness denies the Employer's version and the remark according to the employee's version, if made, was nothing more than a subjective reaction of an employee, which is irrelevant to the question of whether there was, in fact, objectionable conduct. *Janler Plastic Food Mold Corporation*, 186 NLRB 540 (1970).

> The conduct attributed to the Petitioner by the Employer by the second employee witnesses, [Clydus Gray] that 'they are coming down hard on me,' as well as the conduct allegedly conveyed to the Employer by the third employee witness, [Jamie Gray] that 'Taylor is leaning on me,' which is denied by the third employee witness, does not contain any specific threat, and at most are vague remarks subject to more than one interpretation, including legitimate campaign propaganda. The remaining statements attributed to the Petitioner

by the Employer were denied by the fourth [Bob Burkett] and sixth [Joseph Tate] above referred to employee witnesses and even if made by representatives of the Petitioner to those employees do not constitute objectionable conduct. So, these statements, if made, do not indicate a pattern of intimidation or an atmosphere of coercion, and, at most are merely campaign propaganda and do not warrant setting aside the election.

Contrary to O'Daniel's suggestion, the Regional Director did not make credibility determinations in overruling O'Daniel's objections. Rather, he found that even if the employees made the statements in question, they were insufficient to meet O'Daniel's burden of showing "that the Union engaged in objectionable conduct that so influenced voters that free choice was impossible." We agree.

 Employee Baldwin does not identify who told her that she would lose work, insurance, and retirement benefits if she voted against the Union. Clydus Gray also failed to identify who was "coming down hard" on him. To support a contention that the Union engaged in inappropriate conduct, it is axiomatic that the Union or its representatives must be identified as the source of the conduct. Without such identification, the election will not be set aside. *See NLRB v. Chicago Tribune Co.*, 943 F.2d 791, 795 (7th Cir.1991) (upholding the Board's refusal to set aside an election, in part, because "[t]he Company presented no evidence that in any way demonstrates that the alleged threats either were made by the Union or interfered with the results of the election").

O'Daniel argues that Jamie Gray's statement that "Taylor is leaning on me" shows that the Union engaged in coercive tactics. However, we agree with the Board that this statement is ambiguous. Gray's statement may indicate that Taylor was employing entirely legitimate, but persuasive technics, designed to influence her vote. Or it may, as O'Daniel contends, suggest something else. Nevertheless, the statement is insufficient to show that the Union engaged in coercive conduct. Finally, the statements of Burkett, Shook, and Tate in no way suggest that the Union's conduct was improper.

O'Daniel has simply failed to present facts sufficient to meet its burden of showing that "substantial evidence does not support the Board's decision." Therefore, we find that the Board did not err in overruling O'Daniel's objections without holding a hearing.

### Conclusion

For all of the foregoing reasons, the decision of the Board is ordered ENFORCED.