# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1058

LOCAL 15, INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, AFL-CIO,

*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

and

MIDWEST GENERATION, EME, LLC,

*Intervenor*.

Petition for Review of an Order of the
National Labor Relations Board.
No. 13-CA-39643-1

ARGUED SEPTEMBER 27, 2005—DECIDED OCTOBER 31, 2005

Before FLAUM, *Chief Judge,* and BAUER and SYKES, *Circuit Judges*.

FLAUM, *Chief Judge.* Petitioner Local 15, International Brotherhood of Electrical Workers, AFL-CIO ("Union") petitions this Court for review of an order of the National Labor Relations Board ("NLRB" or "Board") finding that the Intervenor, Midwest Generation, EME, LLC ("Midwest"), did not violate sections 8(a)(1) and (3) of

the National Labor Relations Act ("NLRA"). 29 U.S.C. §§ 158(a)(1) and (3). Because substantial evidence did not support the Board's decision, we reverse the holding and remand to the Board to determine whether Midwest's unfair labor practices render the current collective bargaining agreement void.

## I. Background

The Union began an economic strike against Midwest on June 28, 2001, over stalled negotiations for a new collective bargaining agreement. Approximately 1150 workers went on strike. Eight employees refused to strike ("non-participants"). During the course of the strike, 47 employees who were part of the Union made individual offers to return to work ("crossovers"). Midwest accepted each of these offers and reinstated the individual employees. Sixteen employees crossed the picket line in July, and thirty-one crossed between August 1 and August 30. Six additional employees made offers to return to work shortly before the strike ended on August 31. Midwest returned these last six crossovers to the workforce between September 1 and September 6. In all, a combination of sixty-one crossovers and non-participants offered to return to the workforce before the end of the strike.

Midwest continued to operate during the course of the strike, relying upon supervisors, contractors, and some temporary replacement employees. Midwest hired no permanent replacements. No evidence that the sixty-one non-participants and crossovers were necessary to maintain operations during the strike was submitted. Employees who returned to work were not questioned concerning their status in the Union and Midwest did not encourage or assist any employee in resigning from the Union.

On Friday, August 31, 2001, after failing to reach a collective bargaining agreement, the Union members

voted to end their strike and offered to return to work unconditionally. Midwest initially gave no response to this offer, but on September 6, 2001, Midwest informed the Union that it was instituting a lockout. The Union alleges that the purpose of the six-day delay in announcing the lockout was to process the last six crossovers.

The lockout did not include those sixty-one workers who offered to return to work before the Union made its unconditional offer on August 31. Midwest locked out any employee who sought to return to work after the Union had voted to end the strike; and the lockout continued until the parties reached a collective bargaining agreement. The announced purpose of the lockout was to exert pressure upon the Union to meet Midwest's contract demands.

On October 3, 2001, the Union voted on Midwest's "final offer." The Union informed Midwest that it believed if the NLRB later found Midwest had committed an unfair labor practice during the lockout, the contract would be "void because the Company's unfair labor practice[s] . . . coerced the employees into accepting it. Nothing the Union or its representatives say or do should be interpreted as a waiver of this position." On October 3, 2001, the Union rejected the offer. The Union sent a similar notification letter before a second vote on the same contract. On the second vote, the contract passed easily. The lockout officially ended on Monday, October 22, 2001.

Midwest informed the Union in early September that it would not allow employees who had not previously offered to return to work access to their jobs "until a new contract is agreed to and ratified[.] [E]mployees who had already returned to work, or were scheduled to return to work prior to Friday, August 31, 2001 [would] be allowed to continue to work."

Although at times all but eight of the approximately 1,150 workers were on strike, Midwest maintained normal

operations throughout the strike and lockout. Midwest contends that the non-strikers and crossovers "helped the company weather the work stoppage's effects." Midwest also contends that the sixty-one employees had "abandoned an economic strike undertaken for the express purpose of supporting the Union's bargaining demands."

In response to an unfair labor practice charge filed by the Union, the General Counsel of the National Labor Relations Board issued a complaint against Midwest on March 7, 2002, for unfair labor practices in violation of NLRA sections 8(a)(1) and (3). 29 U.S.C. §§ 158(a)(1) and (3). The complaint alleged that Midwest committed an unfair labor practice by refusing to reinstate employees who were on strike at the time of an unconditional offer to return to work, while allowing other workers who had already returned or planned to return to work access to their jobs. The parties waived an ALJ hearing and stipulated to the record. The Board issued a Decision and Order on September 30, 2004, finding that Midwest had not violated the Act. There was a dissent from the three-member board decision.

There is no evidence of bad faith by either party, nor is there any evidence that Midwest gave the crossovers or non-participants special treatment before or after the lockout.

The only issue for resolution submitted to the Board, and therefore the only issue for this Court to review, was stipulated to by the parties:

Whether the Company violated Sections 8(a)(1) and (3) of the [National Labor Relations] Act by locking out and/or refusing to reinstate those employees who were on strike at the time of the union's unconditional offer to return to work, while not locking out and/or reinstating those individuals employed by the Company who, prior to the union's unconditional offer to return to work, had ceased participating in the strike by making

an offer to return to work, and had either returned to work or scheduled a return to work at the Company?

## II. Discussion

### A. Standard of Review/Method of Analysis

Board Rulings are "entitled to considerable deference so long as [they are] rational and consistent with the [National Labor Relations] Act." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990); *see also NLRB v. United Food, Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987). This Court, however, is not "obliged to stand aside and rubberstamp [its] affirmance of administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291 (1965).

This complaint was brought under section 10(a) of the National Labor Relations Act, 29 U.S.C. § 160(a), for a violation of sections 8(a)(1) and (3) of the Act. 29 U.S.C. §§ 158(a)(1) and (3). Section 8 states that it is an unfair labor practice for an employer to interfere with employees' rights that are protected by section 7 of the NLRA, which includes the right to "engage in . . . activities for the purpose of collective bargaining." 29 U.S.C. § 157. The basic procedure to evaluate whether a company has engaged in an unfair labor practice was first outlined by the Supreme Court in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967).

The first question in the *Great Dane* framework is whether the employer's conduct is "inherently destructive of important employee rights." 388 U.S. at 34. Actions that harm the collective bargaining process, interfere with employees' right to strike, or are taken against employees based upon union status are "inherently destructive." *Esmark, Inc. v. NLRB,* 887 F.2d 739, 748 (7th Cir. 1989). To

be "inherently destructive," the effect on the collective bargaining process must be more than temporary; it must instead establish a barrier to future collective bargaining. *Id.* If an action by an employer is inherently destructive of important rights, no proof of an anti-union motivation is needed. *Great Dane*, 388 U.S. at 34.

A harmful action by an employer that is not inherently destructive is classified as "comparatively slight." These two categories, "inherently destructive" harm and "comparatively slight" harm, make up the two prongs of the *Great Dane* framework. Under the first prong of the *Great Dane* test ("inherently destructive"), an employer's actions are submitted to a stringent test. Such actions are permissible only if after balancing business justifications against employee rights, the business justification is found to be superior. Under the second prong of the *Great Dane* test, ("comparatively slight"), an employer's actions are more likely to be justified. "[A] finding of comparatively slight harm calls for a threshold test of business justification, rather than a balancing of interests." *Int'l Bhd. of Boilermakers v. NLRB*, 858 F.2d 756, 762 n.2 (D.C. Cir. 1988). If an individual employer's actions cannot be justified under the comparatively slight harm standard, which requires a legitimate and substantial business justification, they clearly cannot be justified under the "inherently destructive" standard.

Under either prong, once it has been established that the employer's conduct negatively affects protected section 7 rights, the key question for the Board, informed by *Great Dane,* is whether the employer can state a business justification for its actions. If an employer can show no legitimate and substantial business justification, the lockout is presumptively an unfair labor practice under either prong of the *Great Dane* analysis.

Thus, the question of whether a "legitimate and substantial" business justification exists is a threshold question,

properly asked prior to any decision as to whether an action is "comparatively slight" or "inherently destructive" under *Great Dane.* If a legitimate and substantial business justification is found for an employer's action, the question of whether the harm caused was "inherently destructive" or "comparatively slight" is then examined and the *Great Dane* analysis proceeds.

## B. Failure to Prove a Business Justification

Apart from which *Great Dane* prong a particular case might be analyzed under:

> once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, *the burden is upon the employer to establish that he was motivated by legitimate objectives* since proof of motivation is most accessible to him.

*NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34 (1967) (emphasis added); s*ee also Inland Steel Co.*, 257 N.L.R.B. 65, 68 (1981), *enforced. mem.* 681 F.2d 819 (7th Cir. 1982) ("The employer alone is responsible for its conduct and it alone bears the burden of explaining the motivation for its actions.").

A "legitimate and substantial" business justification must have a non-frivolous purpose. *Harter Equipment Inc.*, 280 N.L.R.B. 597, 600 n.9 (1986); *see also Great Dane*, 388 U.S. at 38. The issue then is whether Midwest has shown that its lockout had any business justification that was neither frivolous nor based upon an impermissible violation of section 7 rights.

The Board's majority opinion advanced two arguments in support of its finding that Midwest instituted the partial lockout for the valid purpose of "bringing economic pressure to bear in support of its legitimate bargaining position."

*Midwest Generation*, 343 N.L.R.B. No. 12, 3 (2004).[1] First, the Board stated that partial lockouts are legal "when justified by operational needs and without regard to union membership status." *Id.* at 4 (citing *Bali Blinds Midwest*, 292 N.L.R.B. 243, 246-47 (1988); *Laclede Gas Co.*, 187 N.L.R.B. 243, 243-44 (1970)). Second, the Board concluded that locking out only those participating in the strike on August 31 was a lawful means of pressuring holdouts to abandon their bargaining position.

The dissent responded to these justifications for the partial lockout, noting:

> Notwithstanding the complete lack of supporting argument and evidence, the majority sua sponte proclaims that the Respondent's operational needs justified the partial lockout. The majority's concoction of a post hoc operational rationalization for the partial lockout does not and cannot fulfill the Respondent's obligation to proffer a legitimate and substantial business justification.

*Id.* at 6 (Walsh, dissenting) (citing *Inland Steel Co.*, 257 N.L.R.B. 65, 68 (1981), *enforced. mem.* 681 F.2d 819 (7th Cir. 1982)).

## 1. Operational needs did not justify the partial lockout.

Prior to the Board's decision, Midwest offered no proof that its operational needs justified the partial lockout.

---

[1] There is a discrepancy between the numbering of the pages in the slip opinion produced by the Board and given to this Court by the parties and the page numbers in this opinion as available on the Westlaw service. The page numbers cited in this opinion correspond to the page numbers in the slip opinion, which is part of the record.

Indeed, the record indicates that Midwest's operational needs were being "successfully maintained . . . through the efforts of supervisory personnel, contractors, and some temporary replacement employees." In raising the operational needs justification sua sponte, the Board cited two cases, *Bali Blinds Midwest*, 292 N.L.R.B. 243, 246-47 (1988) and *Laclede Gas Co.*, 187 N.L.R.B. 243, 243-44 (1970). These cases are not analogous to the factual situation faced by Midwest. Rather, these cases illustrate the extreme business exigencies necessary to justify a partial lockout based upon operational needs.

In *Bali Blinds Midwest*, the employer's partial lockout was justified because it ensured that repeated work stoppages, which were legitimately feared, would not delay production and result in a loss of customers. 292 N.L.R.B. 243, 246-47 (1988). In *Laclede Gas Co.*, the Board found that the need to ensure continuing business operations and avoid public hazards justified the employer's disregard of normal seniority practices during a lockout. 187 N.L.R.B. 243, 243-44 (1970) ("[T]he temporary shutdown of the construction crew's operations was actually necessitated by the exigencies of the business operation[.] . . . [O]perating on the basis of daily contract extensions was difficult, unproductive, and potentially dangerous to the public[.] . . . [The lockout] was motivated by a desire to eliminate those operations which negotiations had rendered tentative and to protect the [employer] from overextending itself at a critical moment, all of which were essentially defensive purposes[.]") (internal quotation marks omitted). There has been no comparable allegation of exigent circumstances in the instant case.

In its brief, Midwest attempts to support the Board's operational needs justification by citing additional cases in which partial lockouts were permitted. Among those cases is *General Portland, Inc.* 283 N.L.R.B. 826 (1987). Unlike the factual situation faced by Midwest, *General*

*Portland* illustrates an extreme situation in which operational needs justify a partial lockout. General Portland allowed employees to continue to manage enormous kilns that operate at 2700 degrees Fahrenheit and take between twelve hours and three days to shut down completely. Crossovers continually staffed these kilns in an effort to prevent "explosions, injury, and damage." *Id*. at 827. In contrast, the record is silent as to any necessity that would sanction the use of a partial lockout by Midwest.

The facts of this case further belie the operational needs justification. First, Midwest's own claims demonstrate that it successfully maintained operations throughout the strike without the use of crossover employees or non-strikers. Midwest does not argue that the lockout was based upon operational needs, but rather states its intent "to pressure [the employees] to abandon [their] demands." Second, the last six crossover employees did not even start work until after the August 31 unconditional offer to return to work, which demonstrates that these employees were unnecessary for continued operation. Third, early in the strike Midwest was able to maintain operations with only eight of the approximately 1,150 employees who were members of the bargaining unit. The claim that these eight employees and/or the last six crossovers, together representing less than 2% of the total bargaining unit, were so vital to the maintenance of business operations that it was necessary for Midwest to violate employees' section 7 rights stretches the bounds of credulity.

Every indication in the stipulated facts is that the crossovers and non-strikers were unnecessary to the continuation of business operations. Midwest and the majority opinion of the Board charge the dissent with advocating for a standard of "indispensab[ility] to continued operations in order to be retained" during a partial lockout. The dissent, however, never employs the word "indispens-

able." The dissent accurately notes that the "Respondent does not even argue that it needed the non-strikers and crossovers to maintain operations during the lockout." *Midwest Generation*, 343 N.L.R.B. No. 12, 7 (Walsh, dissenting) (2004).

In any event, a standard less demanding than "indispensable" cannot provide employers with carte blanche to lock out employees of their choosing without regard to seniority or any other criteria. Such an approach would allow employers acting under the guise of maintaining business operations to engage in exactly the type of action Midwest undertook: punishing those who stood with the Union and rewarding those who crossed picket lines.

Demanding more than Midwest's labeling of its conduct as "necessary for business operations" does not establish strike-hiring practices that are difficult for employers to comply with. Instead, it merely avoids creating a "business operations" exception with no limiting principle, which would sanction discriminatory conduct by an employer where the employer chooses to announce its position as "necessary for business operations" without evidence supporting such a need. Simply put, to justify a partial lockout on the basis of operational need, an employer must provide a reasonable basis for finding some employees necessary to continue operations and others unnecessary.

## 2.  The partial lockout was not justified as a lawful means of economically pressuring holdouts.

Throughout the course of this litigation, Midwest contended that it allowed the non-strikers and crossovers to return to work because they "had removed themselves from the Union's economic action," making it unnecessary to pressure them into abandoning the Union's bargaining position. This allegation rests on the proposition that "working for a struck employer may, without more, be equated with abandonment of the Union's bargaining demands." *Midwest Generation*, 343 N.L.R.B. No. 12, 6 (Walsh, dissenting) (2004). This assumption is fatally flawed. There can be several reasons why an employee might choose to cross a picket line. Abandonment of the Union's bargaining demands is merely one possible explanation, standing alongside individual financial motivations, personal relationships with employers, indifference, an attempt to impress management, etc. Midwest has failed to offer any direct correlation between employees' non-participation in a strike and lack of support for the Union's demands.

Midwest claims that it was unnecessary to lock out the crossovers and non-strikers because they had taken "affirmative action in derogation of the Union's bargaining position." Any business justification that relies upon workers having "removed themselves from the Union's economic action," or argues that by returning to their jobs, workers had abandoned their demands cannot carry the day in this case. When Midwest announced the selective lockout, all of the employees in the bargaining unit had removed themselves from the economic strike by offering to return to work. The only distinction between employees was whether an individual worker had made his or her offer to return as part of the Union's action or individually.

Midwest argues that an employee who has returned to work no longer demonstrates a commitment to the Union's

position. Therefore, no economic pressure against such an employee is required. What Midwest fails to note is that at the time of the lockout, all employees had offered to return to work.

There is no evidence in the record indicating why individual employees chose not to participate in the strike. It is unclear and unknown whether non-strikers and crossovers voted for or against Midwest's collective bargaining agreement proposals. The Board infers that "it was no longer necessary for the Respondent to place additional pressure upon [crossover workers and non-strikers] in order for [Midwest] to achieve its bargaining goals." *Midwest Generation,* 343 N.L.R.B. No. 12, 5. This statement is without affirmation in the record of this case. Nothing has been presented to distinguish the motivation of those who offered to return to work before August 31 and those who offered to return to work after August 31. Given this absence of evidence, the Board's claim that additional pressure was necessary for one group, but not another, is unsupportable.

The Board relied upon Midwest's post hoc subjective beliefs to find that crossovers and non-strikers did not back the Union's bargaining position. In turn, Midwest relies upon a common sense notion that employees who cross a picket line have abandoned the Union's position. While this is not an unreasonable conclusion, it is not supported by any evidence beyond mere conjecture.

The Board also justified the use of a partial lockout on the basis that "there is nothing in the law that requires an employer to use maximum economic pressure." *Midwest Generation,* 343 N.L.R.B. No. 12, 5. While this statement is a truism, it does not address the relevant question before the Board. The burden remains upon the employer to prove that it had a legitimate and substantial basis for its actions. In this case, the Board appears to find sufficient any reason presented by Midwest without evidence of a

"legitimate and substantial" basis for distinguishing between those employees it locked out and those it did not.

While we find no foundation for the assumption that those employees who crossed the picket line were not supporters of the Union's position, assuming arguendo that Midwest could irrefutably prove that crossovers and non-strikers had abandoned the Union's bargaining position, it still could not discriminate on this basis.

Both the NLRB and the Fifth Circuit have found that an employer "may not discriminate against certain employees merely because it anticipates that they will honor a picket line or otherwise engage in protected activity." *National Fabricators v. NLRB*, 903 F.2d 396, 400 (5th Cir. 1990). An employer's discriminatory lockout on the basis of a protected activity is unlawful even when it is supportive of an employer's bargaining position.

> Lockouts are not all protected . . . . The Seventh Circuit in *Inland Trucking Co. v. N.L.R.B.*, 440 F.2d 562 (1971), affg. 179 NLRB 350, cert. denied 404 U.S. 858, held that an employer violated Section 8(a)(1) and (3) by locking out its employees and continuing operation with the use of new hires. The *American Ship Building* rule does not give the employer license to pick and choose among its employees and suspend those whose protected picket line activities are most damaging to it. The mere selection of such an employee from among all those in the unit for suspension is per se discriminatory.

*Thrift Drug Co.*, 204 N.L.R.B. 41, 43 (1973).

The Board in this case appears to launch a new approach with no discernable parameters. If employers were free to exercise economic penalties selectively against those employees whom they believe economic coercion would be most effective, an employer could take discriminatory actions that have traditionally been barred. Under

the Board's analysis, an employer could choose to lock out only union leaders or only employees it believes voted against a proposed contract. This type of discrimination cannot be a legitimate and substantial business justification for a partial lockout.

Not only has Midwest failed to put forth a legitimate and substantial business justification, but in its attempts to justify the partial lockout it has given further support to the Union's claim that the lockout was used in a retributive fashion to discourage employees from exercising their section 7 right to strike.

"[T]here is an obvious disparate treatment of employees," when an employer locks out

> only those employees who, by striking, had identified themselves as union adherents, while continuing to operate with those employees who had not joined the strike[.] . . . [B]y deliberately limiting the impact of the lockout to those employees who had struck, [an employer] discriminate[s] against them for striking, and by such action violate[s] Section 8(a)(3) and (1) of the Act.

*McGwier Co. v. NLRB*, 204 N.L.R.B. 492, 496 (1973).

In the context of collective bargaining negotiations, nearly all employer actions are attempts to win an economic battle. Merely because retribution against strikers may be effective does not make such actions legitimate and substantial. The fact that employers have acted with the "best judgment as to the interests of their business . . . has not been deemed an absolute defense to an unfair labor practice charge." *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 229 n.8 (1963).

Based on the record presented in this appeal, there is no line that can be drawn between those employees that agreed to return to work before August 31 and those employees who agreed to return to their positions after August 31. As of the time of the lockout, every employee

had made an unconditional offer to return to work. Without a valid basis for distinction between those locked out and those allowed to work, Midwest's claim of a legitimate and substantial business justification fails.

### 3. Midwest displayed anti-union animus.

If Midwest's claim of no anti-union animus were to have any basis, it necessarily would contradict its earlier claim of a legitimate and substantial business justification. Either employees were locked out in a completely blind fashion, thereby offering no legitimate and substantial business justification, or they were chosen on the basis of their Union activities and therefore the action was based upon invalid anti-union motivations.

By acting only against those who had exercised their section 7 right to strike, Midwest appears to have demonstrated an anti-union animus. The *only* distinction between the two groups of employees at the time of the lockout was their participation in Union activities. Discriminating in a way that has a natural tendency to discourage participation in concerted union activities is a violation of section 8(a)(3) of the National Labor Relations Act. *See Erie Resistor Corp.,* 373 U.S. at 233; *see also Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 39-40 (1954). As the dissent in this case succinctly stated, "The effect of the lockout's disparate treatment of employees is to undermine adherence to the Union by demonstrating to employees the advantages from the standpoint of job security of refraining from concerted activity." *Midwest Generation,* 343 N.L.R.B. No. 12, 7 (Sept. 30, 2004) (Walsh, dissenting) (citing *McGwier Co.*, 204 N.L.R.B. 492, 496 (1973); *O'Daniel Oldsmobile, Inc.*, 179 N.L.R.B. 398, 402 (1969)).

The Board argued in its brief to this Court that employees could have avoided " 'punishment' by simply agreeing to the Company's bargaining demands." Following this logic, a

partial lockout would be valid provided any offer, no matter what the terms, was made to the employees. This approach would permit inappropriate deference to employers' intent in partial lockout situations.

A partial lockout is a significant measure that requires a justification beyond economic effectiveness. The fact that employees could avoid partial lockouts by agreeing to employer demands would in effect validate all partial lockouts. Undoubtably, this would render ineffective the requirement of a legitimate and substantial business justification for discriminatory employer action and would be in derogation of nearly four decades of employee protection. *See NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967); *see also* 29 U.S.C. §§ 157, 158(a)(1), (3).

## III.  Conclusion

For the reasons set forth above, we REVERSE the findings of the Board and REMAND to the Board with instructions to find that the partial lockout was an unfair labor practice. We also REMAND to the Board to consider whether this unfair labor practice coerced the Union and its members into ratifying Midwest's contract offer, thereby voiding the collective bargaining agreement.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*